**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jesse Johnson, | No. CV-25-01300-PHX-SHD |
| Plaintiff, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

Pending before the Court is Defendants the City of Phoenix and Michael Sullivan's (collectively, "Defendants") Motion to Dismiss Plaintiff Jesse Johnson's Complaint, (Doc. 9). Johnson responded, (Doc. 12), and Defendants replied, (Doc. 15).[1] Because Johnson has failed to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6), the motion will be **granted**, with leave to amend.

## I.     BACKGROUND

On September 24, 2022, two City of Phoenix Police Department ("the Department") officers shot and killed a man who was throwing large rocks at their patrol vehicles. (Doc. 1 at ¶¶ 12–18.) Plaintiff Jesse Johnson was one of the officers. The Department later terminated Johnson for his role in the shooting, citing Operations Order 1.5.1.A, (the "Sanctity of Life Provision," or "Provision"), among other procedures. (*Id.* at ¶¶ 33–34.) The Sanctity of Life Provision provides that "the Department respects the dignity of all

---

[1]     The parties did not request oral argument, and oral argument is not necessary, so this motion is decided without holding a hearing. *See* LRCiv 7.2(f).

persons and recognizes the sanctity of human life, rights and liberty." (*Id.* at ¶¶ 31, 33–34 (cleaned up).) Johnson now brings this action under 42 U.S.C. § 1983. He alleges that Defendants deprived him of a constitutional right when they terminated him for violating the Sanctity of Life Provision because the Provision is unconstitutionally vague. (*Id.* at ¶¶ 41–44.)

### A. The Shooting

The Complaint alleges that Johnson began working for the Department as a certified police officer in January 2020. (*Id.* at ¶ 4.) On the day of the shooting, an individual identified as "Mr. Osman" threw "a large rock at a marked Phoenix PD patrol vehicle occupied by two other officers—Officer O. and Officer G." (*Id.* at ¶ 10). The officers called for backup, and Johnson responded. (*Id.*) When Johnson arrived on scene, Osman "started pelting [Johnson's] patrol vehicle with large river rocks." (*Id.* at ¶ 11.) One of the rocks Osman threw "caused a five-centimeter puncture through the front metal hood" of Johnson's vehicle. (*Id.*)

Johnson parked, got out of his patrol vehicle, and "confronted [Osman], giving him verbal commands to stop throwing rocks." (*Id.* at ¶ 12.) At this time, Officers O. and G. also exited their patrol vehicle. (*Id.* at ¶ 13.) Osman continued to throw rocks at Johnson, one of which hit him. (*Id.* at ¶ 14.) Osman then "took an overhand throwing stance with a rock in his hand and took aim again at Officer Johnson." (*Id.* at ¶ 15.) Johnson and Officer O. both "fired their duty weapons at" Osman, "ending the threat." (*Id.* at ¶ 16.) The officers provided medical care "until paramedics arrived to transport [Osman] to the hospital, where he was later pronounced dead." (*Id.* at ¶ 19.)

Johnson fired three rounds at Osman and Officer O. fired one round. (*Id.* at ¶ 17.) The medical examiner determined that Osman's cause of death was "a single gunshot wound to the neck." (*Id.* at ¶ 20.) Johnson alleges that the Department "did not investigate the trajectory of the shots fired by the officers on scene and did not determine which single round" killed Osman. (*Id.* at ¶¶ 18, 20.)

**B.    The Investigation and Johnson's Termination**

Following the shooting, the Department and the Maricopa County Attorney's Office ("MCAO") conducted independent investigations. (*Id.* at ¶¶ 21, 23.) The MCAO did not prosecute either Officer O. or Johnson. (*Id.* at ¶ 23.)

The Department's administrative investigation began with the Professional Standards Bureau ("PSB"). (*Id.* at ¶ 21.) One year after the shooting, on September 27, 2023, the PSB issued a report which "made no findings of alleged misconduct" and "forwarded [the investigation] to the Critical Incident Review Board for review." (*Id.* at ¶ 25.) The Critical Incident Review Board reviewed the shooting on February 13, 2024, and "recommended that [the shooting] be designated as in accordance with [the Department's] policy." (*Id.* at ¶ 27.)

Defendant Michael Sullivan, the Chief of Police, reviewed the Board's recommendation, but ultimately determined that Johnson's "actions were out of policy." (*Id.* at ¶ 28.) On April 9, 2024, Sullivan conducted a *Loudermill* hearing,[2] at which Johnson appeared with a representative from the Phoenix Law Enforcement Association. (*Id.* at ¶ 29.) Ten days later, on April 19, 2024, Johnson was served a "Discipline Notice that terminated his employment." (*Id.* at ¶ 31.) Johnson's Discipline Notice "cited violations of four Phoenix Personnel Rules" and Operations Order 1.5.1.A, the Department's Sanctity of Life Provision. (*Id.* at ¶ 25.)

Johnson alleges that the Department has "never disciplined any employee" for violation of the Sanctity of Life Provision, and further, that it has "never provided guidance or training specific to" the Sanctity of Life Provision. (*Id.* at ¶¶ 35–36.) He also alleges that Officer O., who also shot at Osman, was not terminated but rather, was placed on a 24-hour suspension. (*Id.* at ¶ 39.) Officer O.'s Discipline Notice stated that he had violated

---

[2]    A *Loudermill* hearing is a pre-termination hearing that a public employee must receive before being terminated from a job in which they have a protected property interest. *See Cleveland Bd. of Ecud. v. Loudermill*, 470 U.S. 532, 542–543 (1985).

Operations Order 1.5.2.H, which provides that "[e]mployees will assess situations to determine if de-esclation is possible, and if so, employ appropriate de-esclation tactics to reduce the potential need to use force or reduce the level of force needed," and Operations Order 1.5.3.A, which provides that "[i]t is the policy of the Department to use a reasonable amount of force to conduct lawful public safety activities." (*Id.*) Officer O.'s Discipline Notice did not cite the Sanctity of Life Provision. (*Id.*)

### C.    The Response to Resistance Policy

The Sanctity of Life Provision is the first sentence in a 13-page policy, Operations Order 1.5, which outlines the Department's "Response to Resistance" policy (the "Response Policy").[3] Section 1 of the Response Policy, under which the Sanctity of Life Provision falls, is titled "General Information," and outlines the basic principles undergirding the Response Policy. Relevant here, those principles are (1) that the Department "respects the dignity of all persons and recognizes the sanctity of human life, rights and liberty" (the Sanctity of Life Provision); (2) that all employees have a duty to intervene "when they know or should know another employee is using unreasonable force"; (3) that all employees "will be trained and instructed in these policies before employing any of the weapons, tactics, or techniques"; and (4) that employees "will assess situations to determine if de-escalation is possible" and "employ appropriate tactics to . . . reduce the potential need to use force or to reduce the level of force needed." (Doc. 9-1 at 2 (emphasis removed).)

In Section 2, the Response Policy lays out several definitions, including "deadly physical force," which is defined as "any tactic or response to resistance that creates a

---

[3]    Defendants attached the complete Response Policy to their motion, and request that judicial notice be taken. (Doc. 9 at 3 n.3.) Johnson does not object to judicial notice. (*See generally* Doc. 12.) Because the Response Policy is a public record, and forms the basis of Johnson's Complaint, judicial notice is appropriate. *See United States v. Ritchie*, 342 F.3d 903, 908–09 (9th Cir. 2003) (explaining that courts may refer to evidence outside the pleadings at the motion to dismiss stage when it is "incorporated by reference" or is an "adjudicative fact[] . . . not subject to reasonable dispute." (quotation marks omitted)).

substantial risk of causing death or serious physical injury, such as the use of a firearm"; and "excessive force," defined as "[t]he application of an unreasonable amount of force in a given incident based on the totality of the circumstances."[4] (*Id.* at 3.)

Section 3 of the Response Policy sets forth the Department's "General Policy" regarding the use of force. It provides that it is the Department's policy "to use a reasonable amount of force to conduct lawful public safety activities" and that "the response option employed will be reasonable and based on the totality of the circumstances." (*Id.* at 4.) It also establishes reporting requirements, noting that any employee "involved in a response to resistance incident [has] the responsibility of providing the facts and circumstances they believe justified the response to resistance by completing the necessary reports, memorandums, etc." (*Id.*) Section 3 then outlines the "circumstances that may govern reasonableness of using a particular response option." (*Id.*) Citing *Graham v. Connor*, 490 U.S. 386 (1989), the Response Policy states that the primary factors are (a) the severity of the crime, (b) whether the subject poses an immediate threat to the safety of officers or others; and (c) whether the subject is actively resisting arrest or attempting to evade arrest. (*Id.*) This section reiterates that force must be reasonable under the totality of the circumstances. (*Id.* at 4–5).

Section 4 of the Resistance Policy sets forth an officer's "Response Options." The response options vary in severity from mere presence, to "Tripping/Tackling," "Pointed Gun at Person (PGP)," the use of irritants, tasers, batons, "Direct Impact Munitions" like stunbag shotguns, and finally, "Deadly Physical Force," which includes the use of firearms. (*Id.* at 6–10.) This section identifies the narrow circumstances in which deadly force is permitted, including "when such force is reasonable to protect [the employee] or a third person from another's use, or threatened use, of deadly physical force," and emphasizes that deadly force is "a last resort when other measures are not practical under the existing

---

[4] Section 2 also defines "reasonable belief," "less-lethal force," "serious physical injury," "types of resistance," "response options," and "de-escalation/escalation strategies." (Doc. 9-1 at 2–3.)

circumstances." (*Id.* at 9–10.)  It also notes that "employees who discharge any firearm will make a verbal report to a supervisor as soon as practical." (*Id.* at 10.)

Section 6 of the Resistance Policy, "Shootings and Other Critical Response to Resistance Incidents," details the reports and investigations that are required when a shooting occurs, stating that "[a]ll shootings . . . resulting in death or serious injury . . . will be investigated concurrently by" (1) the PSB, (2) the involved employee's supervisor, and (3) the Violent Crimes Bureau. (*Id.* at 13.)  The PSB's report is then sent to the Critical Incident Review Board chairperson. (*Id.* at 15)

Operations Order 3.18, the Department's "Discipline Policy," states that "[a]ny violation of City or Department policy," whether the employee is on or off duty, "may result in discipline."[5] (*Id.* at 16.)  It further specifies that "[i]ntentional discharge of a firearm (with injury) in violation of policy" is a "class III violation" and may result in suspension, referral to the Police Chief for a *Loudermill* hearing, or termination. (*Id.* at 40–41.)

### D.    Procedural History

On April 18, 2025, Johnson filed this case alleging that Defendants violated 42 U.S.C. § 1983 when they terminated him for violating the Sanctity of Life Provision. (Doc. 1 at ¶¶ 41, 44.)  Johnson alleges that the Provision is so vague that "an officer of ordinary intelligence" cannot determine the "conduct it prohibits" and that it "encourages arbitrary enforcement," and thus runs afoul of the Fourteenth Amendment's substantive due process clause. (*Id.* at ¶¶ 41–45.)  He brings both a facial attack, asserting that the Sanctity of Life Provision is unconstitutionally vague on its face, and an as-applied challenge, which asserts the Provision is unconstitutional as applied to him.[6] (*Id.*)

---

[5]    The Court will also take judicial notice of the Discipline Policy, which Defendants have attached to their Response. (Doc. 9 at 14 n.7 (requesting judicial notice of the Discipline Policy).)  It is a public record, and Johnson has not objected to judicial notice. *See Ritchie*, 342 F.3d at 908–09.

[6]    Throughout the parties' briefing, they appear to conflate two distinct issues: whether Johnson used reasonable force and whether the Sanctity of Life Provision is

On July 25, 2025, Defendants moved to dismiss for failure to state a claim. (Doc. 9.) Defendants' motion raises three issues: First, Defendants argue that Johnson cannot challenge the Sanctity of Life Provision on its face because it does not implicate the First Amendment. (*Id.* at 3–4.) Second, Defendants contend that Johnson has failed to state a claim for his as-applied challenge because the Sanctity of Life Provision is sufficiently definite. (*Id.* at 4–14.) And finally, Defendants assert that Sullivan should be dismissed from this action because he is sued only in his official capacity. (*Id.* at 15.) The motion is fully briefed. (Docs. 12, 15.) Because Johnson's facial attack depends on the success of his as-applied challenge, the Court will first address whether the Provision is constitutional as applied to Johnson.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true" and construed in the light most favorable to the plaintiff, "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). A claim is plausible if the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). In making this determination, legal conclusions are not accepted as true, nor are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" considered. *Id.*; *see also id.* ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." (cleaned up)). That said, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need *detailed* factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (emphasis added). A "well-pleaded complaint may proceed even if . . . actual proof of those facts is improbable, and [ ] a recovery is very remote and unlikely." *Id.* at 556 (cleaned up).[7]

---

unconstitutionally vague. The Court only addresses the latter.

[7]    Johnson cites *Hishon v. King & Spalding*, 467 U.S. 69 (1984), for the outdated "no set of facts" pleading standard. (Doc. 12 at 2.) But it is well-established—and has been for nearly twenty years—that *Twombly* overruled the "no set of facts" pleading standard.

## III.    DISCUSSION

### A.    Constitutional Challenge to the Sanctity of Life Provision

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  A policy "can be impermissibly vague for either of two independent reasons." *Hernandez v. City of Phoenix*, 541 F. Supp. 3d 996, 1000 (D. Ariz. 2021), *aff'd*, 43 F.4th 966 (9th Cir. 2022).  "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," and second, "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).  "In the public employment context, policies 'are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge.'" *Id.* (quoting *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992)); *see also Arnett v. Kennedy*, 416 U.S. 134 (1974) (applying these principles in the public employment context).

### 1.    As-Applied Challenge

To succeed on his as-applied challenge, Johnson must plead facts supporting the reasonable inference that the Sanctity of Life Provision is so vague that either (1) "ordinary persons using ordinary common sense" would not be aware that shooting at a civilian would "put them at risk of discharge" under the Provision, or (2) that the Provision "authorizes or even encourages arbitrary and discriminatory enforcement." *Hernandez*, 541 F. Supp. 3d at 1001; *Recreational Dev. of Phoenix, Inc. v. City of Phoenix*, 83 F. Supp. 2d 1072, 1087–89 (D. Ariz. 1999).  At bottom, the Provision must not be so vague that it deprives officers of fair warning and fair enforcement. *Grayned*, 408 U.S. at 109–13 ("Vague laws may trap the innocent by not providing fair warning" of prohibited conduct or by not giving "explicit standards for those who apply them.").

---

550 U.S. at 562–63 (holding that *Conley's* "no set of facts language" has "earned its retirement" and "is best forgotten").

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Courts apply a less stringent vagueness test when the challenged language imposes "civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.*; *see also Arnett*, 416 U.S. at 159 (noting that a statute regulating federal employment was not drafted "for the purpose of defining criminal conduct"). In addition, vagueness challenges are "consistently evaluate[d] . . . in light of the sophistication of the persons or entities subject to the law." *Oregon Ass'n Hospital and Health Sys. v. Oregon*, 734 F. Supp. 3d 1139, 1157 (D. Or. 2024), *aff'd*, 2025 WL 1833815 (9th Cir. 2025) (collecting cases). Thus, it is appropriate to consider whether an "ordinary *officer* should understand what conduct might reasonably put them at risk of discharge or punishment." *Hernandez*, 541 F. Supp. 3d at 1003 (emphasis added). Relatedly, "[l]aw enforcement agencies are entitled to deference, within reason, in the execution of policies and administrative practices that are designed to preserve and maintain security, confidentiality, internal order, and esprit de corps among their employees." *Aguilera v. Baca*, 510 F.3d 1161, 1171 (9th Cir. 2007) (quotation marks omitted); *see also Kelly v. Johnson*, 425 U.S. 238, 247 (1976) (holding that police regulations are entitled to the same "wide latitude accorded [state and local] government in the dispatch of its own internal affairs" (quotation marks omitted)); *Hernandez*, 541 F. Supp. 3d at 1002 (applying the deference owed to law enforcement agencies to a vagueness challenge).

Finally, allegedly vague phrases are not analyzed in isolation. Courts will consider surrounding statutory text, as well as accompanying regulations and procedures in determining whether an enactment is unconstitutionally vague. *See Arnett*, 416 U.S. at 160 (reasoning that the challenged language "was not written upon a clean slate in 1912, and it does not appear on a clean slate now"); *Grayned*, 408 U.S. at 110–13 (assessing vagueness based upon "the words of the ordinance itself," including its preamble; limiting interpretations by courts of analogous language; and "the interpretation of the statute given

by those charged with enforcing it"). Nor do courts require "mathematical certainty" from the challenged language. *Grayned*, 408 U.S. at 110. Indeed, "[t]here are limitations in the English language with respect to being both specific and manageably brief." *Arnett*, 416 U.S. at 159 (quoting *United States v. Hariss*, 347 U.S. 612, 618 (1954)). Consequently, courts will not "convert into a constitutional dilemma the practical difficulties" of crafting employee regulations that are both "general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Id*. at 159–60.

In the end, plaintiffs "seeking to invalidate a statute for vagueness carr[y] a heavy burden." *Health Sys.*, 734 F. Supp. 3d at 1155. They must allege that the challenged enactment "is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather . . . that no standard of conduct is specified at all.'" *Id.* (quoting *Hoffman*, 455 U.S. at 495 n.7).

a.   <u>Fair Warning</u>

With these principles in mind, the Court turns to the Sanctity of Life Provision as applied to Johnson's conduct. To begin, officers of ordinary intelligence are on notice that they may be terminated if they violate the Provision. The Department's Discipline Policy states that any violation of Department policy may result in discipline. (Doc. 9-1 at 16.) "Discipline" includes termination. (*See id.* at 17–18 (defining types of possible discipline, including written reprimands, suspension, demotion, and termination).) The Sanctity of Life Provision is a part of the Department's Response Policy. (*Id.* at 2.) It is thus clear that violation of the Provision could result in termination.[8]

The parties' dispute centers on whether an officer of ordinary intelligence has fair warning that conduct like Johnson's could violate the Sanctity of Life Provision. As noted

---

[8] The parties do not dispute this point. Johnson argues only that he cannot discern what conduct violates the Sanctity of Life Provision, not that he did not know he could be terminated for violating it. (*See generally* Doc. 12.)

above, the Sanctity of Life Provision is the first sentence in the Department's Response Policy. (*Id.* at 2.) It states: "The Department respects the dignity of all persons and recognizes the sanctity of human life, rights, and liberty." (*Id.* at 2.) It follows that violating a person's dignity, or the sanctity of human life, rights, and liberty, would in turn violate the Department's policy respecting the same.

There is little more threatening to human dignity or the "sanctity of human life, rights, and liberty" than shooting a gun at a civilian. When an officer uses deadly force, the risk of loss of life, rights, and liberty is significant—if not inherent—and, on many occasions, the impact to the subject of the deadly force is permanent. There may be close cases, situations in which an officer uses lesser force and its impact on the sanctity of life, rights, and liberty is difficult to discern. But the use of deadly force—which is, fundamentally, force intended to deprive another of their life, rights, and liberty—is not one of them. *See Arnett*, 416 U.S. at 159 (reasoning that when "the general class of offense to which the [challenged] provisions are directed is plainly within their terms, and they will not be struck down as vague, even though marginal cases could be put where doubts might arise" (cleaned up)). Every time an officer fires a gun at a civilian, they risk violating the sanctity of life, and therefore, the Department's Sanctity of Life Provision. The Provision thus provides "ordinary officer[s]" fair warning that Johnson's conduct, firing three rounds at a civilian, "might reasonably put them at risk of discharge or punishment."[9] *See Hernandez*, 541 F. Supp. 3d at 1003.

Importantly, any ambiguity in the Sanctity of Life Provision is mitigated by the remainder of the Response Policy. *See California Teachers Ass'n v. State Bd. of Educ.*, 271 F. 3d 1141, 1154 (9th Cir. 2001) ("in analyzing . . . a statute's vagueness . . . it is necessary to consider the context in which the statute operates"). Johnson concedes that

[9]    The Complaint implies that Johnson may not have fired the bullet that killed Osman. (Doc. 1 at ¶ 18.) Drawing reasonable inferences in Johnson's favor, as courts must at this stage, it is therefore assumed the relevant conduct for the vagueness analysis is shooting at a civilian, rather than shooting and killing a civilian.

the Sanctity of Life Provision "precede[s] an elaborate Use of Force policy which [identifies] acceptable conduct in use of force situations."[10] (Doc. 12 at 5.) His description is apt. The Response Policy identifies (1) the types of response options available to officers when confronted with resistance, (Doc. 9-1 at 5–10 (detailing varying levels of force from mere "presence" to "deadly physical force")); (2) factors to consider before using force, (*id.* at 4–5 (including the "severity of crime" and whether the "subject poses an immediate threat" to officers or the public)); and (3) defines what constitutes unreasonable, or excessive force, (*id.* at 2 (defining excessive force as an "unreasonable amount of force . . . based on the totality of the circumstances")).

With respect to deadly force, the Response Policy provides further guidance, instructing officers that the use of deadly force is "a last resort when other measures are not practical under the existing circumstances" and is only appropriate when (1) necessary "to protect [officers] or a third person from another's use, or threatened use, of deadly physical force"; (2) to "prevent the escape of a subject whom [officers] . . . believe have committed an offense involving the infliction or threat of serious physical injury or death and is likely to endanger human life or cause serious injury to another unless apprehended without delay"; or (3) in "situations where [officers] must overcome or prevent an attack [they] believe would produce serious physical injury or death to the employee or another person." (*Id.* at 9–10.)

These standards reflect the factors the Supreme Court has identified in determining the reasonableness of force. (*Id.* at 4 (citing *Graham v. Connor*, 490 U.S. 386 (1989) for relevant factors to determine the reasonableness of force and stressing that reasonableness depends on "the totality of the circumstances")). As the Supreme Court stated in *Graham*,

---

[10] Johnson appears to argue that because his Discipline Notice only cited the Sanctity of Life Provision, the remainder of the Response Policy is irrelevant. (*See* Doc. 12 at 5 (arguing that "here, [the Sanctity of Life Provision] was uncoupled from any reference to the remainder of the [Response Policy]").) But that Johnson's Discipline Notice did not cite other provisions of the Resistance Policy does not render it irrelevant to the vagueness analysis. *See Grayned*, 408 U.S. at 110–13 (considering the challenged language's context); *Cal. Teachers Association*, 271 F. 3d at 1154 (same).

determining the reasonableness of an officer's use of force, "requires careful attention to the facts and circumstances of each particular case," and as a result "is not capable of precise definition or mechanical application."  490 U.S. at 396 (quotation marks omitted).  The Response Policy—like the test in *Graham* upon which it is based—may be "imprecise," but it is a "comprehensible normative standard" against which officers routinely measure their conduct.  *See Health Sys.*, 734 F. Supp. 3d at 1155 (quotation marks omitted).  As such, it is sufficient to provide officers with "fair warning" of what conduct is prohibited.

Nonetheless, Johnson argues that the Sanctity of Life Provision "fails to state when deadly force is permissible and when alternatives should be exhausted."[11]  (Doc. 12 at 8.)  In doing so, he invokes one of the most challenging questions facing courts and police officers alike: when does an officer's life outweigh the life of a civilian?  (*See id.* at 6.)  Johnson seeks certainty where there is none.  An officer's decision to use deadly force is inherently ambiguous; it does not follow that any language regulating that decision is unconstitutionally vague.  *See Arnett*, 416 U.S. at 159–60 (quoting *Colten v. Kentucky*, 407 U.S. 104, 110 (1972) (declining to "convert into a constitutional dilemma the practical difficulties" of crafting employee regulations that are both "general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited")).  And contrary to Johnson's assertion, this ambiguity reinforces, rather than undermines, the need for "an admittedly general standard" like the totality of the circumstances test.  *Id.* at 159.  It would be impossible for the Department to "define the precise circumstances of every conceivable" use of unreasonable force.  *See Young v. Dep't Transp. Nat. Safety Bd.*, 886 F.2d 334 (Table), 1989 WL 112407 at *2 (9th Cir. 1989).

Johnson's argument does raise a unique characteristic of police work relevant to this

_____

[11]  To be clear, the Response Policy does state "when alternatives should be exhausted"—in fact, it is unequivocal on this point: deadly force is a "last resort" that should only be used "when other measures are not practical."  (Doc. 9-1 at 10.)

analysis. "[P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. Those judgments will generally be later scrutinized by law enforcement departments, investigative bodies, and eventually, if criminal charges are brought or civil relief sought, the courts. Thus, when a Department officer decides to use deadly force, he or she will not know with certainty if, in the eyes of the Department or the law, it is a "reasonable" use of force and therefore consistent with the Response Policy. In fact, a final reasonableness determination may not be made until well after the incident occurs—in Johnson's case, over a year later. Thus, when officers use deadly force, they take the risk that the Department will conclude it was not "reasonable" and terminate them for violating the Response Policy.

The Response Policy makes clear that officers are at risk of termination any time they use deadly force. Any interaction between officers and civilians involving an officer's firearm is reported for investigation. If an officer points a gun at a civilian, it must be reported to a supervisor for investigation. (Doc. 9-1 at 11.) Any discharge of a firearm, whether accidental or intentional, must be reported to a supervisor for investigation. (*Id.* at 13.) If an officer discharges a weapon and it results in injury or death, three concurrent investigations begin—one by the officer's supervisor, one by the PSB, and one by the Violent Crimes Bureau/Homicide Unit. (*Id.*) Officers who use any type of force, including deadly force, must defend their use of force "by providing the facts and circumstances they believe justified the response to resistance" in a "Response to Resistance report." (*Id.* at 4.) These requirements make one thing abundantly clear: every time officers use deadly force, they will be subject to a rigorous investigatory process that may result in termination.

When read as a whole, the Response Policy provides clear standards of conduct that mitigate any ambiguity in the Sanctity of Life Provision. It identifies the tests against which an officer's conduct will be measured and provides guidelines for how officers should decide to use deadly force. It also makes clear that every use of deadly force will be thoroughly investigated by the Department, thus placing officers at risk of discharge.

- 14 -

To survive a vagueness challenge, officers need not be certain that their conduct will lead to termination; they need only have fair warning that their conduct may "put them *at risk* of" termination. *Hernandez*, 541 F. Supp. 3d at 1001 (emphasis added). The Sanctity of Life Provision gives officers of ordinary intelligence fair warning that when they shoot a gun at a civilian—as Johnson did here—they may be at risk of discharge.

b.    <u>Fair Enforcement</u>

To survive a vagueness challenge, the Sanctity of Life Provision must "provide explicit standards for those who" enforce it. *Grayned*, 408 U.S. at 108. Absent such standards, it would "impermissibly delegate[] basic policy matters to [officials] for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108–09. At the same time, "enforcement requires some degree of . . . judgment." *Id.* at 114. Thus, the challenged language need only "define[] boundaries sufficiently distinct" such that officials can exercise a "degree of judgment [that] is permissible." *Id.*

Viewed in isolation, the Sanctity of Life Provision arguably lacks "explicit standards" for enforcement. But, as detailed above, the Response Policy sets out a robust set of standards for what constitutes reasonable and unreasonable force. (*See* Doc. 9-1 at 2–13.) And while the Response Policy leaves significant discretion in the hands of supervising officers, it also provides for the flexibility and individualized assessment necessary to evaluate use-of-force incidents. *See Grayned*, 408 U.S. at 110 (upholding statute "marked by flexibility and reasonable breadth, rather than meticulous specificity" (quotation marks omitted)); *Prime Healthcare Servs., Inc. v. Harris*, 216 F. Supp. 3d 1096, 1125 (S.D. Cal. 2016) ("[T]hat the Attorney General has discretion and may base her determination on subjective criteria does not render the statute void for vagueness."). Again, the Response Policy applies the same standards for determining whether force is reasonable as the Supreme Court. (Doc. 9-1 at 4–5); *Graham*, 490 U.S. at 396. Our high court's endorsement significantly undermines Johnson's concerns that the Response Policy grants unfettered discretion to officials who enforce it.

- 15 -

In addition to the standards outlined in the Response Policy, the Department has a thorough and exacting investigation process, involving several internal and external levels of review. (*See* Doc. 9-1 at 13.) This includes three concurrent investigations by the officer's supervisor, the PSB, and the Violent Crimes/Homicide Unit. (*Id.*) The Use of Force Board[12] ("UFB") also reviews shootings and use-of-force incidents for consistency with Department policy, and employees involved in those incidents must appear before the UFB, where they are "give[n] the opportunity to relate the circumstances and decision processes in the use of force incident and respond to board questions." (*Id.* at 27.) The Discipline Review Board ("DRB") then reviews all "violations of the rules and regulations of the Department that are classified as a suspension, demotion, or termination." (*Id.* at 26.) Employees may also appear before the DRB, to "respond to any sustained assertions made against them" and "submit relevant written material in support of their position." (*Id.*) Before termination, officers are also offered a *Loudermill* hearing. (*Id.* at 38.) Such procedures further limit any danger that the Response Policy authorizes or encourages arbitrary or discriminatory enforcement.

Johnson argues that the Department's treatment of Officer O. supports his claim that the Sanctity of Life Provision is so vague that it encourages arbitrary and discriminatory enforcement. (Doc. 12 at 9–10.) That the Department reached different conclusions concerning Johnson and Officer O.'s conduct, however, does not render the Response Policy unconstitutionally vague. *United States v. Agront*, 773 F.3d 192, 198 (9th Cir. 2014) (rejecting the argument that a statute was unconstitutionally vague because only one of three offenders was cited for violating the challenged provision). When more than one officer is involved in a shooting, it is within the Department's discretion to evaluate the officers' different actions before, during, and after the incident to determine whether, and to what extent, each officer violated the policy—and discipline each officer accordingly. This is precisely the permissible degree of judgment that the Response Policy provides.

---

[12]    The Use of Force Board is also referred to as the Critical Incident Review Board by the parties. (*See* Doc. 12 at 13.)

*Grayned*, 408 U.S. at 114.

Johnson also notes that Sullivan's finding that Johnson violated the policy conflicted with the Critical Incident Review Board's recommendation. (Doc. 12 at 12.) Different people can reach different conclusions about the application of the Response Policy, however, without rendering it unconstitutionally vague. *See Young*, 886 F.2d 334 (Table), 1989 WL 112407 at *2 (rejecting the argument that "the mere fact that experienced pilots disagree as to whether [plaintiff's] operation of the helicopter violated the regulations proves that the statute is unconstitutionally vague"); *cf. Smith v. United States*, 431 U.S. 291, 309 (1977) ("Similarly, the possibility that different juries might reach different conclusions as to the same material does not render the statute unconstitutional." (citations omitted)). The Response Policy provided Sullivan with sufficient parameters to decide whether Johnson violated the Sanctity of Life Provision. Johnson has not alleged sufficient facts to support the reasonable inference that its application to his conduct was arbitrary or discriminatory.[13]

Finally, the Court notes that similarly broad phrases regulating employee conduct repeatedly withstand vagueness challenges. *See e.g.*, *Arnett*, 416 U.S. at 158–59 (rejecting facial attack on statute that allowed federal employees to be terminated for "such cause as will promote the efficiency of the service"); *Tindle v. Caudell*, 56 F.3d 966, 973 (8th Cir. 1995) (upholding police department regulation that prohibited officers from "engag[ing] in any personal act or conduct" that "could result in justified criticism of the officer or the department" and further that "[n]o officer shall be involved personally in any disturbance

---

[13] Much of Johnson's argument reads as a challenge to Sullivan's decision to fire Johnson in light of the Critical Incident Review Board's recommendation that his conduct was not out of policy. (*See* Doc. 12 at 12.) But whether Sullivan made the right decision is not the question before the Court, which need only consider whether the Sanctity of Life Provision and Response Policy provided Sullivan with appropriate guardrails within which to exercise his discretion. Because it does, Johnson's as-applied challenge fails. *See Prime Healthcare Servs., Inc. v. Harris*, 216 F. Supp. 3d 1096, 1126 (S.D. Cal. 2016) ("[Plaintiff's] argument at its core challenges [Defendant's] conduct and alleged abuse of discretion, not the vagueness of the Statute.").

or police incident to his discredit."); *Flanagan v. Munger*, 890 F.2d 1557, 1569 (10th Cir. 1989) ("[B]road rules such as ones condemning conduct unbecoming an officer, or . . . conduct impairing the operation or efficiency of the department or bringing the department into disrepute, have been generally upheld against challenges of facial vagueness." (citation omitted)); *Hernandez*, 541 F. Supp. 3d at 998, 1003 (holding that social media policy banning posts that could "cause embarrassment to" or "discredit . . . in any way" the police department were not unconstitutionally vague).

Indeed, employers may use general terms to address a wide range of employee conduct. *See Arnett*, 416 U.S. at 159–61. They may also invoke lofty principles to hold their employees to high moral standards. *See id.* at 161 ("The most conscientious of codes that define prohibited conduct of employees includes 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.'" (citation omitted)). If catchall phrases as broad as "conduct unbecoming an officer" provide adequate guardrails, a provision that incorporates standards expressly endorsed by the Supreme Court necessarily does too. Johnson has thus failed to allege that the Sanctity of Life Provision is so capacious that it encourages arbitrary or discriminatory enforcement. Johnson's as-applied challenge to the Sanctity of Life Provision therefore fails and will be dismissed.

### 2. Facial Challenge

Defendants also argue that Johnson may not assert a facial vagueness challenge because the Sanctity of Life Provision does not implicate First Amendment rights. (Doc. 9 at 4.) To support this proposition, they cite *United States v. Jae Gab Kim*, 449 F.3d 933, 942 (9th Cir. 2006) which states that "vagueness challenges to statutes that do not involve First Amendment violations must be examined as applied to the defendant." (*Id.*) While there are "a number of Ninth Circuit cases that appear to make this point," "the underlying law is significantly more complicated." *Schuchardt v. Sousa*, 753 F. Supp. 3d 1161, 1178 (D. Idaho 2024) (collecting cases).

"It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."

*United States v. Mazurie*, 419 U.S. 544, 550 (1975) (citation omitted).  This does not, however, preclude facial challenges to policies that do not implicate the First Amendment. *Kashem v. Barr*, 941 F.3d 358, 375–76 (9th Cir. 2019).  Rather, outside the First Amendment context, "[a] plaintiff who engages in some conduct that is clearly proscribed [by the challenged law] cannot complain of the vagueness of the law as applied to the conduct of others."  *Id.* at 375 (quotation marks omitted).  This principle is grounded in "the traditional rules governing constitutional adjudication" which establish "that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others."  *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973)).  Thus, as a general rule, a litigant "who cannot sustain an as-applied vagueness challenge to a statute cannot be the one to make a facial vagueness challenge to the statute."  *Id.* (acknowledging that some exceptions to this rule exist, such as challenges to clauses that "d[o] not lend themselves easily to a traditional as-applied analysis").  In sum, unless First Amendment rights are implicated, a person who is not injured by the vagueness of a statute lacks standing to pursue a facial challenge.  *See id.; see also Broadrick*, 413 U.S. at 610–11.

Whether Johnson may bring a facial challenge to the Sanctity of Life Provision thus depends on whether the Provision, as applied to him, is unconstitutionally vague.  Because Johnson has failed to state a claim for his as-applied challenge, his facial challenge will also be dismissed.

**B.    Official Capacity Claim Against Sullivan**

Having found that Johnson has failed to state a claim against all Defendants, the Court need not address whether his claim against Sullivan in his official capacity is proper.[14]  Nonetheless, because Johnson will be given leave to amend his Complaint, it is worth noting that a suit against a municipal official in his official capacity is treated as a

---

[14]    Johnson asserts that Defendants failed to meet and confer on this issue. (Doc. 12 at 3.)  Because the Court dismisses the Complaint on other grounds, it need not consider whether Defendants met their conferral obligations on this issue, and Plaintiffs' request to strike it is moot.

suit against the municipality itself. *Center for Bio-Ethical Reform, Inc. v. Los Angeles, Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008). Johnson names the City as a defendant, so his § 1983 claims against Sullivan in his official capacity are likely redundant. *See id.* ("When both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant."); *Ogbonnaya v. City of Mesa*, 2015 WL 241444, at *3 (D. Ariz. 2015); *Luke v. Abbott*, 954 F. Supp. 202, 203 (C.D. Cal. 1997) (dismissing claims against city official in his official capacity as redundant). The Court thus doubts the propriety of Sullivan being a named defendant.

### C.    Leave to Amend

Rule 15 provides that the "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). As the term "freely" suggests, this "policy is to be applied with extreme liberality." *Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1102 (9th Cir. 2018) (quotation marks omitted). "Although leave to amend should be given freely, denying leave is not an abuse of discretion if it is clear that granting leave to amend would have been futile." *In re Cloudera, Inc.*, 121 F.4th 1180, 1189–90 (9th Cir. 2024) (quotation marks omitted).

Johnson has not sought leave to amend, nor has he identified any additional facts he could plead that would bolster his claims. (*See generally*, Doc. 12.) Given the detailed nature of the Response Policy, and its clear application to an officer's use of deadly force, it is evident that any amendment would be futile. Leave to amend will therefore be denied.

### IV.    CONCLUSION

The Court holds that the Sanctity of Life Provision provides fair warning to officers of ordinary intelligence that shooting at a civilian would place them at risk of discharge, and that, together with the remainder of the Response Policy, it does not encourage arbitrary or discriminatory enforcement. Johnson's as-applied challenge thus fails, and he cannot bring a facial challenge.

Accordingly,

**IT IS ORDERED** granting Defendants' Motion to Dismiss for Failure to State a Claim, (Doc. 9), with prejudice.

**IT IS FURTHER ORDERED** directing the Clerk of Court to dismiss this case and enter judgment accordingly.

Dated this 23rd day of March, 2026.

Honorable Sharad H. Desai
United States District Judge